UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE WILHELM, | No. 2:22-cv-02323 DJC SCR P |
| Plaintiff, | |
| v. | ORDER AND FINDINGS & RECOMMENDATIONS |
| SANDAR AUNG, | |
| Defendant. | |

Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights action under 42 U.S.C. § 1983. Pending before the undersigned are the parties' cross motions for summary judgment. For the reasons set forth below, the undersigned recommends that plaintiff's motion for summary judgment (ECF No. 41) be denied, and defendant's motion for summary judgment (ECF No. 46) be granted.

**PROCEDURAL BACKGROUND**

I.   **Plaintiff's First Amended Complaint**

The action is proceeding on plaintiff's first amended complaint ("FAC") filed on June 26, 2023. (ECF No. 8.) The FAC names Dr. Aung, plaintiff's physician since "about July 2018," as defendant. (Id. at 3.) Plaintiff alleges he has serious prostate and kidney issues of which Dr. Aung was aware. (Id. at 6.) On September 16, 2020, Dr. Aung examined plaintiff's stomach, which was "extended and hard." (Id. at 3.) Plaintiff alleges it was obvious there was a

1

problem; however, Dr. Aung "did no follow up." (Id. at 3-4.) After an appointment with a Dr. Daram on February 8, 2021, more than a gallon of urine was drained from plaintiff's kidneys and stomach. (Id.) Plaintiff alleges the urine back-up into his kidneys caused him to be in between stage 3 and 4 of kidney disease, and that the problems could have been avoided if Dr. Aung had "followed through" after examining plaintiff on September 16, 2020. (Id. at 4.)

The previously assigned magistrate judge screened plaintiff's FAC pursuant to 28 U.S.C. § 1915A and determined it stated an Eighth Amendment deliberate indifference to serious medical needs claim against Dr. Aung. (ECF No. 13.)

## CROSS MOTIONS FOR SUMMARY JUDGMENT

**I.   Filings Related to the Parties' Cross Motions for Summary Judgment**

   **A. Plaintiff's Motion**

In his summary-judgment motion, plaintiff argues defendant Dr. Aung failed to request "further procedures" after examining his distended stomach "somewhere between" January 7, 2019, and December 16, 2019. (Id.) (ECF No. 41 at 2.) Plaintiff construes Dr. Aung's interrogatory response No. 3, dated June 4, 2024, as an admission of her deliberate indifference:

   Q:   What date do you claim, that you examined Wilhelm's stomach?

   A:   Defendant Aung does not claim that she personally or specifically examined Plaintiff's stomach during her visits with him.

(Id. at 31.) The motion is supported by defendant's other discovery responses and plaintiff's medical records, including notes following a catheter procedure in March 2021. (Id. at 7-71.)

Plaintiff's motion does not include the "Statement of Undisputed Facts" required by Local Rule 260(a). See also Fed. R. Civ. P. 56(a) ("A party asserting that a fact cannot be genuinely disputed must support the assertion by… citing to particular parts of materials in the record[.]"). "Pro se litigants must follow the same rules of procedure that govern other litigants." King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987) (citation omitted), overruled on other grounds, Lacey v. Maricopa County, 693 F.3d 896, 928 (9th Cir. 2012) (en banc). However, it is well-established that district courts must "construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly." Thomas v. Ponder, 611

2

F.3d 1144, 1150 (9th Cir. 2010). Accordingly, in resolving the parties' motions, the undersigned will consider the entire record before it. See Adv. Comm. Note to 2010 Amendments to Fed. R. Civ. P. 56(e)(4) ("[T]he court may seek to reassure itself by some examination of the record before granting summary judgment against a pro se litigant.").

### B. Defendant's Opposition/Motion for Summary Judgment[1]

In her motion/opposition, defendant claims plaintiff "changed the nature his claim mid-suit." (ECF No. 46-2 at 4.) In his FAC, plaintiff alleges Dr. Aung was deliberately indifferent to his medical needs on September 16, 2020. But plaintiff later testified at his deposition, and repeated in his summary-judgment motion, that a Dr. Daram examined him on September 16, 2020, and that Dr. Aung failed to address his conditions sometime in 2019. (Id. at 7.)

Because there is no dispute that Dr. Aung was not plaintiff's assigned provider at any point in 2020, defendant argues that the undersigned should disregard the 2019 allegations and enter summary judgment for defendant based on the allegations in the FAC. Defendant also amended her interrogatory response that she "does not claim that she personally or specifically examined Plaintiff's stomach during her visits with him" to reflect plaintiff's new timeline:

> My original response was verified on June 3, 2024, and served on June 4, 2024. At that time, I understood [plaintiff's] lawsuit to concern my alleged failure to examine his stomach on September 16, 2020, and responded with that time period in mind. However, it is my understanding that on June 25, 2024, Mr. Wilhelm testified that I failed to adequately examine his stomach in 2019. After reviewing the available medical records for that time period, I can say that I performed a review of systems and/or physical exam of [plaintiff's] abdominal, gastro-intestinal, and/or genitourinary area on 1/7/19, 5/3/19, 10/2/19, and 12/16/19.

(Declaration of L. Crenshaw ("Crenshaw Decl."), Exh. B, ECF No. 46-5 at 47.)

After objecting to plaintiff's shifting factual allegations, defendant's motion/opposition raises four primary arguments. First, defendant argues plaintiff's motion fails for lack of causation because the FAC did not allege any conduct undertaken by Dr. Aung. Second, because plaintiff's healthcare grievance concerned events in September 2020 that did not involve Dr. Aung, he has not exhausted his administrative remedies. Third, the care that Dr. Aung did

---

[1] The undersigned granted defendant's request to file a combined opposition and motion for summary judgment. (ECF No. 44.)

provide to plaintiff in 2019 was constitutionally adequate. Finally, Dr. Aung claims that she is entitled to qualified immunity. (ECF No. 46-2 at 8-19.)

### C. Plaintiff's Opposition/Reply

In response, plaintiff admits he was "mistaken" about the date of Dr. Aung's exam, but asserts she failed to identify his symptoms at an appointment on December 16, 2019. (ECF No. 49 at 2.) Plaintiff further argues that the dates in his healthcare grievance, while incorrect, still put the prison on notice on his claim. (Id. at 4 ("The root of the [grievance], is the fact, Aung failed to request any farther treatment, and not the actual date of the exam").)

Plaintiff did not reproduce defendants' "Statement of Undisputed Facts" and admit/deny facts per Local Rule 260(b). (See ECF No. 66 at 1-21.) Again, because plaintiff is proceeding pro se, the undersigned will consider the entire record before it. However, the court will only consider the assertions in plaintiff's filings that have evidentiary support in the record. A party's mere claim that a matter is "disputed" does not suffice to dispute a fact that is supported by competent evidence. See Coverdell v. Dep't of Soc. & Health Servs., 834 F.2d 758, 762 (9th Cir. 1987) (recitations of unsworn factual allegations do not adequately oppose competent evidence presented in a motion for summary judgment).

### D. Defendant's Reply

On reply, Dr. Aung argues that plaintiff's speculation that her treatment in December 2019 caused his serious medical needs more than a year later cannot support liability. (ECF No. 51 at 1-2.) Dr. Aung further argues that the record shows her care was timely and that plaintiff did not complain of stomach pain until October 2020, nearly ten months later. (Id. at 3-4.) Defendant adds that plaintiff's interpretation of his healthcare grievance is "overly liberal" and that it did not in fact put the prison on notice of his specific claims.[2]

### E. Plaintiff's Reply

Plaintiff filed a motion for surrebuttal to defendant's motion for summary judgment.

---

[2] Plaintiff then filed an opposition to defendant's reply (ECF No. 52), which the undersigned construes as a sur-reply. Defendant moved to strike it as improper supplementary material under Local Rule 230(m). (ECF No. 53.) Because plaintiff's sur-reply rehashes the arguments in his reply and does fall into one of Local Rule 230(m)'s exceptions, defendant's motion is granted.

(ECF No. 50.) The undersigned construes the filing as plaintiff's reply brief and will grant his motion. Plaintiff again challenges defendant's amended interrogatory, arguing that her admission that she never examined plaintiff's stomach was not limited to 2020. (Id. at 2.) Plaintiff further claims the absence of bladder problems in mid-2019 or early 2020 is not dispositive because those providers were concerned only with his prostate. (Id. at 4.)

## II.  Material Facts

### A. Dr. Aung's Treatment of Plaintiff in 2018

Dr. Aung first became plaintiff's primary care provider on May 16, 2018, and she continued to treat him until December 16, 2019. (Defendant's Statement of Undisputed Facts ("SUFs") 1, ECF No. 46-4.) Prior to becoming her patient, plaintiff had been diagnosed with stage two kidney disease and an enlarged prostate by previous medical providers. (Id.)

The first appointment with Dr. Aung on May 16, 2018, was scheduled as a follow-up because recent lab results showed plaintiff had elevated Prostate Specific Antigen ("PSA") numbers. (SUF 2.) At this appointment, Dr. Aung performed a review of systems, which involved questioning plaintiff about any symptoms, and a physical exam. Nothing notable was found and Dr. Aung ordered regular bloodwork to monitor plaintiff's kidney disease, referred plaintiff to ophthalmology for glaucoma, and ordered a baseline PSA test to better monitor plaintiff's prostate. (Id.) Plaintiff was instructed that to slow the progression of his kidney disease, he should avoid NSAID medications and make therapeutic lifestyle changes. (Id.) Lab results were received on May 18 showing PSA levels at 23 ng/dl, a further elevation, and creatinine levels of 1.3, indicating stage one kidney disease, an improvement. (SUF 3.)

The next month, on June 12, 2018, plaintiff had an appointment with Dr. Pandove because of complaints of a weak urine stream and nocturia (nighttime urination). (SUF 4.) Dr. Pandove advised plaintiff to consider another urology consult and biopsy. Plaintiff declined at that time. (Id.) On July 17, 2018, plaintiff had his second appointment with Dr. Aung for the primary reason of foot pain. (SUF 5.) Plaintiff indicated he no longer wanted his PSA levels checked and denied nocturia. (SUF 5.) On July 24, 2018, one week later, bloodwork showed plaintiff had a creatinine level of 1.31 mg/dl, and PSA levels of 23 ng/ml. (SUF 6.)

On August 8, 2018, plaintiff had his third appointment with Dr. Aung because of elevated PSA levels. (SUF 7.) At this appointment, Dr. Aung again performed a review of systems and physical exam, noting Plaintiff's abdomen was normal. Dr. Aung discussed a potential fourth biopsy of plaintiff's prostate due to the elevated PSA, and this time referred plaintiff to a urologist with his consent. (Id.) Dr. Aung next saw plaintiff for ophthalmology issues on September 27, 2018, and heel pain on October 16, 2018. (SUF 8.) At neither appointment did plaintiff complain of abdominal pain. At each appointment, Dr. Aung performed a review of systems and physical exam, noting nothing unusual. (Id.)

A second kidney panel was done on October 18, 2018, and showed a creatinine level of 1.30 ml/dl and PSA levels of 28 ng/ml. (SUF 9.) Pursuant to Dr. Aung's orders, plaintiff attended the urology clinic on October 25, 2018. (SUF 10.) The urologist recommended plaintiff undergo a transrectal ultrasound and biopsy of his prostate, which Dr. Hla ordered on November 13, 2018, and occurred on December 6, 2018. (Id.) Dr. Aung followed-up with plaintiff after the ultrasound and biopsy on December 10, 2018. (SUF 11.) At that time, no results had been received, but Dr. Aung ordered a follow-up within two weeks, bloodwork to test PSA levels, and a urinalysis. She noted plaintiff's kidneys had been stable for the past year as reflected in his creatinine levels and ordered continued follow-up testing for that condition. (Id.)

**B. Dr. Aung's Treatment of Plaintiff in 2019**

On January 7, 2019, plaintiff saw Dr. Aung to follow-up on the biopsy results. (SUF 12.) Though no results had been received, Dr. Aung performed a review of systems and physical exam, which was normal. Dr. Aung emphasized the importance of diet and lifestyle change in managing plaintiff's conditions including his kidney disease. She ordered additional testing that occurred the next day and showed a PSA level of 24.9 ng/ml, an improvement from the previous result of 28. (Id.) Tests also showed improved kidney function with creatinine levels at 1.23 mg/dl, which is considered normal for an adult male. A few days later, on January 12, plaintiff's biopsy results came back normal. Given these results, Dr. Aung continued monitoring plaintiff's PSA levels and creatinine levels on a six-month basis, as recommended by his urologist. (Id.)

Dr. Aung saw plaintiff four months later on May 3, 2019. (SUF 13.) She performed a

1 review of systems, vitals, and a physical exam, including of the abdominal/gastrointestinal and
2 genitourinary area, which was normal. (Id.) Additional blood testing was ordered, and plaintiff
3 was again instructed on lifestyle changes to manage his medical conditions. Testing on June 7
4 showed a small downward trend in plaintiff's PSA numbers to 24.7 ng/ml and continued normal
5 and stable kidney function with creatinine levels at 1.23 mg/dl. (Id.)

Dr. Aung saw plaintiff against on October 2, 2019. (SUF 14.) She performed a review of systems, vitals, and a physical exam, including of the abdomen and gastrointestinal area, which was mostly normal, but Plaintiff did complain about increased urination. Dr. Aung ordered a urinalysis in response. (Id.) Updated labs checking PSA and creatinine levels were scheduled to occur in December. Dr. Aung reiterated the importance of lifestyle changes. (Id.) On October 22, the urinalysis results came back showing a possible infection, which can also cause prostatitis and elevated PSA numbers. Dr. Aung prescribed the antibiotic Bactrim. (Id.)

Dr. Aung last saw Plaintiff in 2019 on December 16, 2019. (SUF 15.) She performed a review of systems, vitals, and a physical exam, including of the abdominal/gastrointestinal and genitourinary area, which was normal. Lab results from December 6 showed an increase in Plaintiff's PSA levels to 35.9 ng/ml. Given this increase, Dr. Aung initiated a referral to a urologist on the same day and it was approved four days later on December 20. She was then reassigned and no longer Plaintiff's primary care physician. (Id.)

**C. Plaintiff's Medical Care in 2020-21**

Records indicate plaintiff saw the urologist on February 6, 2020, and that the urologist saw no need for a biopsy or any further intervention, besides the continued monitoring of plaintiff's levels every six months. (SUF 16.) The urologist specifically mentioned that plaintiff's abdomen was normal and his bladder was not distended at this appointment. (Id.)

Plaintiff continued to have regular appointments with various providers in 2020. (SUF 17.) On September 16, 2020, plaintiff saw Dr. Daram for a regularly scheduled appointment. (Id.) Dr. Daram noted plaintiff's creatinine levels tested a 1.30 ml/dl on August 31, 2020, and PSA levels had dropped down to 23.4 ng/ml in June 2020. She performed a systems review and physical exam noting no abnormalities, including a normal abdomen, and continued orders for

7

1  regular monitoring of plaintiff's PSA and creatinine levels.  (Id.)

2  Plaintiff began having intermittent complaints of stomach pain in October 2020 and was referred to the chronic care program for kidney disease on October 12, 2020.  (SUFs 18, 22.)  On February 8, 2021, plaintiff had another appointment with Dr. Daram.  Early 2021 labs showed increased creatinine levels of 2.47 ml/dl, indicating decreased kidney functioning, as well as an increased PSA level of 52.7 g/ml.  Dr. Daram referred Plaintiff to a urologist, ordered a CT scan of his abdomen, and continued monitoring Plaintiff's creatinine levels.  The CT scan was conducted on February 10, 2021, and showed an obstructive uropathy.  (Id.)

Plaintiff was seen by urology on February 18, 2021, and referred for a prostate needle biopsy.  (ECF No. 41 at 69.)  Plaintiff then had a follow-up appointment with Dr. Daram on March 18, 2021.  (Id. at 67.)  Dr. Daram summarized these two events in her notes as follows:

> Patient was seen by urology on 2/18/21 for elevated PSA, bilateral hydro-nephrosis and prostate mass. When patient returned, bilateral hydronephrosis and distended bladder (prostate mass) not addressed at all.  The exam noted that there is no bladder distension and abdominal exam was normal. I saw the patient today again with abdominal exam showing huge pelvic mass (distended bladder). The CT scan showed moderate to severe bilateral hydronephrosis with extreme cortical thinning in both kidneys and the urinary bladder is massively dilated. I had the outside specialty department call the urologist and for him to address the CT scan findings because patient could go into complete renal failure. He did not address the obstruction issue. I received an e-mail back stating that per Dr. Liu, to place a Foley catheter and if unable to, to send the patient to ED. No other recommendations.
>
> Of note: this bladder distension/obstruction has been going on for a long time. Patient was followed by the same urologist who followed his PSA and exam. No where was any documentation of descended bladder or BPH. Patient states that he has had the urinary problem and the bladder distension for a while and he also stated that his any function has been fluctuating over years.

(Id.)  Dr. Daram sent plaintiff to have a Foley catheter placed, which retrieved "almost 3.5 L of urine."  (Id. at 65.)  Plaintiff returned for a follow-up two days later complaining of blood in his urine.  (Id.)  Dr. Daram recommended plaintiff be transferred to higher level of care due to risks of "disability or even death," but plaintiff declined, electing to follow up with Dr. Daram.  (Id.)

### D.  Plaintiff's Healthcare Grievance

On October 9, 2022, Plaintiff filed a healthcare grievance against Dr. Aung that reads:

////

8

> On September 16, 2020, I saw Dr. Aung for medical reasons. I asked Dr. Aung at this appointment to examine my stomach because it was extended and hard. She briefly examined my stomach and made no comment. Nor did she do any follow up. Six months later I was placed under Dr. Daram's care. On 3-18-21, I asked Dr. Daram to examine my stomach… 'immediately' after this examine, Dr. Daram sent me down the hall to see Dr. Rudis (a urologist). He drained more than a gallon of urine from my kidneys and stomach. That back up of urine into my stomach and kidneys for six months, since I last saw Dr. Aung, caused my kidneys to be in a level 3 kidney disease. I was not aware of the level 3 kidney disease until I talked to a nephrologist (kidney specialist 11-18-21). Please remove me from Dr. Aung's care before she causes more damage to my health, and reassign me to Dr. Daram.

(SUF 21.)  On December 6, 2022, Dr. W. Vaughn responded and denied the grievance, noting that it was Dr. Daram that treated plaintiff on September 16, 2020.  (SUF 22.)  Plaintiff appealed, stating "[o]bviously Dr. Aung failed to recognize the serious issue I was having with my stomach, which she briefly examined on 9/16/20, due to kidney and prostate issues. Though Aung was very aware of these issues, she declined to order any further tests for these issues."  (SUF 23.)  On March 13, 2023, a final response denying the appeal was issued.  (SUF 24.)

## SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).

9

1  Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

By contrast,

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 987 (9th Cir. 2006) (quoting C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c). The opposing party must demonstrate the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to

////

see whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Cent. Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

## DISCUSSION

### I. Defendant's Preliminary Objection

The undersigned first addresses defendant's objection that plaintiff changed the nature of his claim at his deposition and in his motion for summary judgment. (ECF No. 46-2 at 9-10.) Defendant argues the undersigned should disregard the 2019 allegations in plaintiff's motion and enter summary judgment for her based on the September 2020 allegations in the FAC, which plaintiff now admits did not involve Dr. Aung. "Absent mutual consent," defendant argues, "a district court may not enter judgment for plaintiff on a claim not pleaded in the complaint." (Id. at 10 (citing Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1171-73 (1st Cir. 1995)).)

There is no dispute that plaintiff's summary-judgment motion rests on different factual allegations than his FAC. Generally, "[a] complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations." Coleman v. Quaker Oats Co., 232 F.3d 1271, 1292 (9th Cir. 2000). "[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings." Wasco Prod., Inc. v. Southwall Techs., Inc., 435 F.3d 989, 992 (9th Cir. 2006). When a plaintiff's conduct fails to put a defendant on notice of new allegations it intends to raise on summary judgment, the

11

new allegations can be disregarded.  See Pickern v. Pier 1 Imports (USA), Inc., 457 F.3d 963, 969 (9th Cir. 2006) (disregarding factual allegations "presented for the first time in [plaintiff's] opposition to summary judgment").

However, the Ninth Circuit has held that "[w]here plaintiffs fail[] to raise [a claim] properly in their pleadings, ... [if] they raised it in their motion for summary judgment, they should [be] allowed to incorporate it by amendment under Fed. R. Civ. P. 15." Desertrain v. City of Los Angeles, 754 F.3d 1147, 1154 (9th Cir. 2014).  "[A] plaintiff need not tender a formal amendment." DeFrenza v. Progressive Express Ins. Co., 345 F. Supp. 3d 1243, 1255 (E.D. Cal. 2017) (citing Edwards v. Occidental Chem. Corp., 892 F.2d 1442, 1445 n. 2 (9th Cir. 1990)).  To determine whether to incorporate by amendment a plaintiff's claim raised on summary judgment, courts must consider five factors: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint.  Desertrain, 754 F.3d at 1154.  "The factors do not carry equal weight; prejudice to the opposing party is the most important."  Earth Island Inst. v. Elliott, 318 F. Supp. 3d 1155, 1168 (E.D. Cal. 2018) (citing Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003)).

Applying the factors here, there is no evidence of bad faith; plaintiff acknowledged at his deposition and in his filings that he was "mistaken" as to the date.  Second, plaintiff's mistake was caught during his deposition, allowing defendant time to amend her discovery responses and oppose the 2019 allegations on summary judgment.  See Kobold v. Good Samaritan Reg'l Med. Ctr., 832 F.3d 1024, 1038 n.4 (9th Cir. 2016) ("[A] claim of prejudice is unpersuasive where defendants fully argued an issue in the summary judgment briefing."); see also Desertrain, 754 F.3d at 1154-55 (no prejudice where defendants were put on notice of plaintiff's proposed claim during deposition).  Plaintiff has amended once, but during the screening stage.

While these factors support amendment, the final factor, futility, favors defendant and is determinative.  See Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend" under Rule 15); Nat. Res. Def. Council v. Pruitt, No. 16-CV-2184 JST, 2017 WL 5900127, at *6 (N.D. Cal. Nov. 30, 2017)

(finding "futility of amendment" factor dispositive to court's Rule 15 amendment through summary-judgment motion analysis). As explained below, even if plaintiff's 2019 allegations were incorporated by amendment, defendant is still entitled to summary judgment on administrative exhaustion and the merits of plaintiff's medical indifference claim.[3]

### A. Whether Plaintiff's Healthcare Grievance Exhausted His 2019 Allegations

#### i. Legal Standard

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see also Merchant v. Corizon Health, Inc., 993 F.3d 733, 742 (9th Cir. 2021) ("Before challenging prison conditions under Section 1983, a prisoner must exhaust 'such administrative remedies as are available.'" (quoting 42 U.S.C. § 1997e(a))). Exhaustion is required regardless of the type of relief sought and the type of relief available through administrative procedures. Booth v. Churner, 532 U.S. 731, 741 (2001). The exhaustion requirement applies to all claims relating to prison life that do not implicate the duration of the prisoner's sentence. See Porter v. Nussle, 534 U.S. 516, 532 (2002).

"[T]o properly exhaust administrative remedies prisoners 'must complete the administrative review process in accordance with the applicable procedural rules,'—rules that are defined not by the PLRA, but by the prison grievance process itself." Jones v. Bock, 549 U.S. 199, 218 (quoting Woodford v. Ngo, 548 U.S. 81, 88 (2006)); see also Reyes v. Smith, 810 F.3d 654, 657 (9th Cir. 2016) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion" (quoting Jones, 549 U.S. at 218)). An untimely or

---

[3] Although Desertrain applied Rule 15 to amendment through summary-judgment motion, see 754 F.3d at 1154, other courts have applied Rule 16's more stringent "good cause" standard for modifying scheduling orders. See, e.g., Neidermeyer v. Caldwell, 718 F. App'x 485, 488 (9th Cir. 2017) (applying Rule 16 over dissent's objection that Desertrain controls); Highfields Cap. I, LP v. SeaWorld Ent., Inc., No. 18-CV-1276 MMA (AGS), 2022 WL 1037210, at *24 (S.D. Cal. Apr. 6, 2022) ("[T]here is no clear rule in the Ninth Circuit that amendment through summary judgment motion—after a Rule 16 scheduling order is in place—falls within the purview of Rule 15 and not Rule 16"). The undersigned need not address this apparent split because amendment here is improper even under the more liberal Rule 15 standard.

otherwise procedurally defective grievance will not satisfy the exhaustion requirement. See Woodford, 548 U.S. at 90. However, a grievance need not (1) include legal terminology or legal theories unless they are in some way needed to provide notice of the harm being grieved; nor (2) contain every fact necessary to prove each element of an eventual legal claim. Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009).

Failure to exhaust is an affirmative defense that defendants must raise and prove. Albino, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting Jones, 549 U.S. at 204). "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under [Federal Rule of Civil Procedure] 56." Id. "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts [relevant to exhaustion]." Id.

### ii. Analysis

Defendant argues that plaintiff has not exhausted the 2019 allegations raised in his deposition and motion for summary judgment. "Although plaintiff filed and exhausted a grievance, it concerned treatment and medical providers in 2020, which did not involve Dr. Aung." (ECF No. 46-2 at 13.) Plaintiff admits his grievance had incorrect dates, but argues it nevertheless put the prison on notice of Dr. Aung's inadequate care in 2019. (ECF No. 49 at 4.)

The operative grievance filed on October 9, 2022, did not exhaust plaintiff's claim as framed in his motion for summary judgment. "To provide adequate notice, the prisoner need only provide the level of detail required by the prison's regulations." Sapp v. Kimbrell, 623 F.3d 813, 824 (9th Cir. 2010). The applicable healthcare grievance regulation required plaintiff to "document clearly and coherently all information known and available to them regarding the issue," including "any involved staff member's last name, first initial, title or position, and the date(s) and description of their involvement." Cal. Code Regs., tit. 15, § 3999.227(g).

Plaintiff's grievance tracks the allegations in the FAC, attributing Dr. Aung's failure to address his stomach ailment on September 16, 2020, to the catheter procedure six months later. There is nothing in the grievance, with its specific date and allegations, that would alert prison officials to plaintiff's theory here that Dr. Aung provided inadequate medical care in 2019. See

1   Griffin, 557 F.3d at 1121 (no exhaustion where plaintiff's grievance "did not provide enough

2   information ... to allow prison officials to take appropriate responsive measures.")  Because Dr.

3   Aung was not his provider in September 2020, a more reasonable interpretation would have been

4   that plaintiff simply named the wrong physician.  Indeed, Dr. Vaughn's institutional-level

5   response denying the healthcare grievance discusses the care provided by Dr. Daram on the date

6   provided.  (See Declaration of D. Gouldy ("Gouldy Decl."), Exh. D, ECF No. 46-6 at 45.)

7       Because plaintiff has not exhausted the 2019 allegations raised for the first time in his

8   motion for summary judgment, the undersigned finds that their incorporation by amendment

9   would be futile.  Accordingly, the undersigned recommends that defendant's motion for

10  summary judgment be granted on the issue of exhaustion alone.

### B. Eighth Amendment Deliberation Indifference to Serious Medical Needs

#### i. Legal Standard

13  Denial or delay of medical care for a prisoner's serious medical needs may constitute a

14  violation of the prisoner's Eighth and Fourteenth Amendment rights.  Estelle v. Gamble, 429

15  U.S. 97, 104-05 (1976).  An individual is liable for such a violation only when the individual is

16  deliberately indifferent to a prisoner's serious medical needs.  Id.; see Jett v. Penner, 439 F.3d

17  1091, 1096 (9th Cir. 2006); Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002); Lopez v.

18  Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000).

19  In the Ninth Circuit, the test for deliberate indifference consists of two parts.  Jett, 439

20  F.3d at 1096, citing McGuckin v. Smith, 974 F.2d 1050 (9th Cir. 1991), overruled on other

21  grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).  First, the

22  plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's

23  condition could result in further significant injury or the 'unnecessary and wanton infliction of

24  pain.'"  (Id., citing Estelle, 429 U.S. at 104.)  "Examples of serious medical needs include '[t]he

25  existence of an injury that a reasonable doctor or patient would find important and worthy of

26  comment or treatment; the presence of a medical condition that significantly affects an

27  individual's daily activities; or the existence of chronic and substantial pain.'"  Lopez, 203 F. 3d

28  at 1131-32 (citing McGuckin, 974 F.2d at 1059-60).

Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. Jett, 439 F.3d at 1096. This second prong is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. (Id.) Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). This "subjective approach" focuses only "on what a defendant's mental attitude actually was." (Id. at 839.) A showing of merely negligent medical care is not enough to establish a constitutional violation. Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998), citing Estelle, 429 U.S. at 105-106.

"[T]o show deliberate indifference, the plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to the plaintiff's health." Hamby v. Hammond, 821 F.3d 1085, 1092 (9th Cir. 2016) (citation and internal quotation marks omitted). A difference of opinion about the proper course of treatment is not deliberate indifference, nor does a dispute between a prisoner and prison officials over the necessity for or extent of medical treatment amount to a constitutional violation. See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Moreover, as for any § 1983 claim, there must be an actual causal link between the actions of the named defendants and the alleged constitutional deprivation. See Monell v. Dep't of Soc. Services, 436 U.S. 658, 691–92 (1978); May v. Enomoto, 633 F.2d 164, 167 (9th Cir. 1980).

### ii. Analysis

Even if plaintiff had exhausted his 2019 allegations, amendment through summary-judgment motion would be futile because his Eighth Amendment medical indifference claim against Dr. Aung fails on it merits.

As to the first element, there is no dispute that plaintiff's stomach and bladder ailments constituted "serious medical needs" by the time of the catheter procedure on March 18, 2021. Plaintiff submits Dr. Daram's notes following the procedure explaining that she immediately sent plaintiff to urology because "he could go into complete renal failure" and "[did] not want to

take any chances." (ECF No. 1 at 67.) After the catheter procedure, Dr. Daram recommended plaintiff transfer to a higher level of care due to the risks of "disability or even death." (Id. at 65.) Dr. Daram also expressed incredulity that urology did not address plaintiff's bladder distention at his appointment a month earlier on February 18, 2021. (Id. at 67.)

Despite this apparent breakdown in plaintiff's care in early 2021, there is no evidence in the record that Dr. Aung contributed or was otherwise deliberately indifferent to plaintiff's needs when she was his provider in 2019. Dr. Aung examined plaintiff four times in 2019, and each time determined his abdominal area was normal. (Declaration of S. Aung ("Aung Decl."), ¶¶ 17-20, ECF No. 46-7 at 6-7.) On December 16, 2019, she identified an elevated PSA level and referred plaintiff to urology for a biopsy to rule out malignancy. (Id., Exh. A, ECF No. 46-7 at 28.) Plaintiff's repeated unsworn statements that Dr. Aung failed to "request any further procedures" after the December 2019 appointment (see, e.g., ECF No. 41 at 2) are belied by the evidence and do not create a factual dispute. See Coverdell, 834 F.2d at 762.

Further, while the requisite causal connection in a § 1983 action can be established "by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury," see Peck v. Montoya, 51 F.4th 877, 891 (9th Cir. 2022), the link between plaintiff's final appointment with Dr. Aung on December 16, 2019, and his deteriorating stomach and bladder conditions in mid/late 2020 is too attenuated to support Dr. Aung's liability. Dr. Aung ceased being plaintiff's provider after the appointment on December 16, 2019 (Aung Decl. ¶ 21, ECF No. 46-7 at 7), and plaintiff saw other providers in early 2020 that did not identify any stomach or bladder concerns. For example, plaintiff met with a urologist on February 6, 2020, whose physical exam results include "abdomen benign" and "bladder not distended." (Aung Decl., Exh. A, ECF No. 46-7 at 62.)

There is evidence that plaintiff's health declined in mid/late 2020. But by the time of these events, plaintiff had not been assigned to Dr. Aung for many months.[4] In her March 2021

---

[4] Plaintiff also accuses Dr. Aung of prescribing nitrofurantoin, which a nephrologist told him "Should never be prescribed to someone with chronic kidney disease." (ECF No. 41 at 3.) Dr. Aung denies prescribing nitrofurantoin, stating that she instead prescribed a different antibiotic called Bactrim. (Aung Decl. ¶ 23, ECF No. 46-7 at 8.) Plaintiff's unsworn hearsay statement

17

1 progress notes, Dr. Daram wrote that plaintiff has had "[w]orsening kidney function since
2 8/31/2020." (Aung Decl., Exh. A, ECF No. 46-7 at 20.) Plaintiff himself reported abdominal
3 pain in October 2020 and was referred to the chronic care program for kidney disease on
4 October 12, 2020. (Gouldy Decl., Exh. D, 46-6 at 45; Aung Decl., Exh. A, ECF No. 46-7 at 71.)

5 Finally, plaintiff overstates the significance of defendant's amended interrogatory No. 3.
6 Defendant did not "recant" her answer as plaintiff suggests (ECF No. 49 at 4) but amended it to
7 conform to plaintiff's revised factual allegations. While defendant's answer that she never
8 "personally or specifically examined Plaintiff's stomach" did not specify a timeframe, it cannot
9 be accepted as a blanket admission where defendant promptly amended it. Cf. Valentich v.
10 United States, 194 F. Supp. 3d 1033, 1037 (E.D. Cal. 2016) (concession in interrogatory
11 accepted as truth where plaintiff signed the answers and never amended the response). Further,
12 plaintiff's reliance on this interrogatory to support his motion is inconsistent with the theory of
13 his own case that Dr. Aung did in fact examine his stomach but failed to "request any further
14 procedures." (ECF No. 41 at 2; see also ECF No. 49 at 2 ("[T]he exam of his stomach, where
15 Aung failed to request any further treatment," was December 16, 2019); Crenshaw Decl., Exh.
16 A, ECF No. 46-5 at 19 ("[W]hen she examined my stomach, she did no further … exams or
17 recommend I go see anybody else or anything in regards to the issue.")).

18 In sum, while plaintiff developed a dangerous kidney condition that ultimately required
19 an urgent catheter procedure in March 2021, there is no evidence in the record that Dr. Aung –
20 whose final examination of plaintiff occurred fifteen months prior to the procedure – was
21 deliberately indifferent to his medical needs or otherwise contributed to his declining condition
22 in mid/late 2020. Therefore, the undersigned finds that incorporation of the 2019 allegations by
23 amendment would be futile. See, e.g., Gutierrez v. M. Sandoval, No. 1:20-cv-1130 JLT EPG
24 PC, 2024 WL 325396, at *6 (E.D. Cal. Jan. 29, 2024) (finding amendment futile where the
25 plaintiff's proposed Eighth Amendment medical indifference claim failed on its merits), report

---

27 does not create a triable dispute. Regardless, the record shows that it was Dr. Daram, not Dr.
Aung, who prescribed nitrofurantoin and discontinued it on July 15, 2021, at the nephrologist's
28 request. (Aung Decl., Exh. A, ECF No. 46-7 at 11.)

and recommendation adopted sub nom. Gutierrez v. Sandoval, No. 1:20-cv-1130 JLT EPG PC, 2024 WL 1343125 (E.D. Cal. Mar. 29, 2024).  Accordingly, summary judgment should be granted to defendant on the merits of plaintiff's medical indifference claim.  In light of this recommendation, the undersigned need not address defendant's qualified immunity arguments.

## CONCLUSION

IT IS HEREBY ORDERED that:

1. Plaintiff's motion for surrebuttal (ECF No. 50) is granted; and

2. Defendant's motion to strike plaintiff's improper supplementary material (ECF No. 53) is granted.

IT IS FURTHER RECOMMENDED that:

1. Plaintiff's proposed amendment through summary-judgment motion be denied;

2. Plaintiff's motion for summary judgment (ECF No. 41) be denied; and

3. Defendant's motion for summary judgment (ECF No. 46) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 16, 2025

SEAN C. RIORDAN
UNITED STATES MAGISTRATE JUDGE